Cases 12, 44, 45, 44, 47, 44, 48, and 44, 93. United States of America v. Douglas Wright, Brandon Baxter, Connor Stevens, and Anthony Hain. Argument not to exceed 30 minutes to be shared by appellants. 30 minutes for appellee. Messrs. Vea, Shadd, Nelson, and Belli for appellants. Good morning. May it please the Court. Paul Nelson. I'm here on behalf of Connor Stevens. Also, we have decided among ourselves that since one of the overriding issues here is common to all four, that I'll be spending most of my time addressing that. Then, you've allotted me 12 minutes. Mr. Shadd, on behalf of Mr. Baxter, is going to take 10, or excuse me, 3 minutes for his initial argument. Mr. Belli will take 3 minutes on behalf of Mr. Hain, and Mr. Vea will take 5 minutes on behalf of Mr. Wright. And then, Mr. Shadd and Mr. Vea will be doing the rebuttal. It's worth noting in this case that the terrorism enhancement in Section 381.4 of the Guidelines does not apply to all, quote-unquote, terrorism offenses. There's a specific definition in the Guidelines that refers to 18 U.S.C. 2332 B.G. 5, and there's a specific definition of federal crime of terrorism. And it's a two-part test. One part of it, there's no dispute, has been met here, that the offenses that the defendants pled guilty to are among the enumerated offenses in that section. However, and again, Counts 1 and 2 deal with a conspiracy intent to use a weapon of mass destruction, and Count 3 deals with attempted damage using a bomb. Although each of those counts specifically allege that the action was taken related to interstate commerce or property in interstate commerce, but those are all three offenses, the statutes under which they were charged, all are listed in the enumerated statutes. But the second part of the test requires a specific intent. Section 2332 B.G. 5a states that the offense has to be calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct. It's broadened somewhat by the Guidelines section here because it's not only those offenses, but it says in addition to those offenses that it involves or was intended to promote a federal crime of terrorism. But it still comes back to the definition of federal crime of terrorism. Who's that trying to influence if not the government? Pardon? Who are they trying to influence if not the government? Well, I think here it was very clear during the, and in fact the government took the position right from the beginning at the evidentiary hearing that the intent of the defendants was to influence the quote-unquote 1%. Well, if they want to redistribute the wealth, it's the government that's got to do it. Well, I would disagree with that. Millionaires in the 1%. If there's a bad outburst being blown up, he's not going to redistribute his wealth on account of it. Well, whether they would have been successful in convincing the 1% to redistribute their wealth is really not the issue here. What their intent was when they took this device and attempted to set it off at that bridge. And there really has been no dispute in the record that their intent was specifically to put pressure on the 1% for whatever reason. That if it is redistribution of wealth, obviously that does not require government action. Well, I don't know. For some, I think if you talk to Bill Gates, for example, or some of the other people that he associates with whose goal is to divest themselves of their entire fortune before they die, that that's redistribution of wealth that has absolutely nothing to do with the government, that the government plays no role in. And I think that here that the, as I said, the government in its opening statement at the evidentiary hearing made clear that the intent here was to destroy the bridge, but the government's... Threw out the bridge. Pardon? Threw out the bridge. It was a, I believe it was state-owned. That's the government. Well, but again, it's government property. That I think it depends on the issue here and what the court should focus on is what their intent was, not how they went about doing it. That, again, it's a specific intent statute, and the mere fact that they're attacking here government property, if their intent is not to get the government to do something but to get individual people to do something, then it doesn't fall within the definition of a federal crime of terrorism. How do we factor in what I recall to be some discussion of bombing the Federal Reserve Building, Northeast Ohio Fusion Center, which is a government building. Weren't these also targets that were discussed at one time, and some acknowledge it by one or more defendants that these were government facilities? Well, I think that there were things like the Fusion Center, which I had not heard of until I got involved in this case. I didn't know that there were such things out there, but, I mean, clearly that's some sort of government agency, and had they attempted to bomb the Fusion Center, I believe it probably would have fallen within the definition of a federal crime of terrorism. However, depending on why they were doing it, if they're trying to get them, you know, if someone these days bombs the NSA to get the NSA to stop reading their emails, or those sorts of things, I think that potentially would fall within there. But, again, the most important thing, there were a lot of issues that were discussed, a lot of potential targets, but the most they became was potential targets. But wouldn't that reflect upon their intent in terms of disrupting government activity, whatever the statute and guidelines reference, that they intended to disrupt the Federal Reserve or the Fusion Center activities? I acknowledge it's not the same as the bridge, but this was all part of their overall intent. Well, again, there was discussion in the record about the fact that some of these things, that everything they tried to do was aimed at the 1%. It was to interfere with the ability of the 1% to make their money, and for that, the fact that they talked about and rejected other potential targets, that when it talks about the guideline, it talks about the offense, it's the offense of conviction, and so what we're talking about here, it has nothing to do with what they talked about before, but, again, they rejected all of those things. There were several potential government targets, more direct government targets, that were considered, but they were all rejected. And so... They made this government target. Well, they didn't do it as a government target. They did it for the purpose, and again, the issue was not who owned the property that was attacked. The reason the statute and the guideline deal with why they did what they did, and the purpose that they did that was to disrupt commerce, to disrupt the 1%. And so the... That, again, here, that focusing on the mere fact that... Well, that's... Their rationale was that by destroying this bridge or damaging the bridge, it would affect the 1%. It would increase benefits for the poor, and that sort of thing. That seems more obvious. Again, the... What somebody calls a general strike or the sites of riot or something like that, it's usually to influence the government to give them more money, whether they do it by taxes or otherwise they end up getting money. That would be more obvious motive. Well, but that's... But again, that may be a result of the action they take. That's not why they took the action. And I think the record's clear. The testimony of the case agent at the evidentiary hearing, the testimony of Mr. Hain, who was one of the people involved in this who testified on behalf of the government, that they made it clear. Mr. Hain, page ID 2459, said that the purpose of blowing up the bridge was, quote, to stop transportation of the 1%. The case agent went through several times. There was a long discussion about exactly what is the 1%, but it came down that this was a financial, not organization, but a classification, I guess, of people, the top 1%. And, for example, when they were talking about looking at the casino, doing something to the casino, that the agent testified, page 2303, that it's a big symbol of the 1%. That taking out a bridge in the business district, when they talked about that as a possible target, page 2318, that that would cause economic disruption. And, say again, on page 2338, when the agent was asked about his understanding of what they said about this bridge, they said that the purpose of targeting the bridge, and quote, it was to stick with the same premise of all the targets before it would strike out at the 1%. And the mere fact that there may have been a government reaction to what they did doesn't make the government their target. And so here, the, say again, even the sentencing commission recognized that there can be certain actions that can have consequences that would not fall within this. In application note 4 to this guideline, it talks about the fact that you can have an act targeting civilian, parts of the civilian population, that that would not fall within the scope of a, quote unquote, federal crime of terrorism. And that's the issue here. We're not talking about whether or not this was a terroristic act or intended to be a terroristic act. But federal crime of terrorism is a specifically defined offense which requires a specific intent by the actors. And here, there's no dispute throughout the whole record, the government's testimony, the government witness' testimony at the evidentiary hearing, that their intent was to attack and cause some problems to the 1%. So what if they had actually attacked the Federal Reserve building, but their intent had been to go after the 1%? Do you think the Hansen would have lied here? If the record showed that that was their intent, that they thought by attacking the Federal Reserve that the 1% wouldn't be able to get their money out of the bank and they'd become destitute or whatever, I don't think it would apply. The other issues that I raised specifically on behalf of Mr. Stevens, I briefed those and I would rely on the brief in that. The only one issue that I would like to point to the court is the judge's statement where he seemed to be indicating that when he was deciding how much of a variance to be, that if you get more time in prison, you're going to get less supervised release and so on, and that's a factor that I think was improperly considered. So we would, on behalf of Mr. Stevens specifically, would ask the court to remand his case for resentencing. Thank you. Thank you. Good morning, Your Honor. It's Kevin Shadiff here for Mr. Baxter. The issue that the court is struggling with, I think, is that obviously the bridge is in itself a government ending, but I think that there are two illustrations which I think can help the court understand the differentiation here. And one of them is kind of borne out in the Leighton case that I cited too in my brief, and in that case you had the mails that were used to – and it was like Resene or some other kind of toxin that was used, and so you had not only U.S. mails that were used, but it was to a post office and there were post office workers that were affected by it. But the person's purpose in that case was to strike out at his specific enemies, which were individuals that were within the community. And in that case there was a remand based upon not – they actually admitted that it couldn't be a terrorism enhancement, but the discussion there was, well, can there be an upward departure because of whether or not it's like a terrorism enhancement? And so they remanded on that case. So in, let's say, the Fusion Center case, let's say that there was a person in the Fusion Center whose ex-husband wanted to kill her and so placed a bomb within the Fusion Center to blow that person up. Well, the intent would be to blow that person up. Of course, government property would be destroyed and other innocent government employees might be destroyed, but you go back to the intent because this specific statute requires a very specific intent, that this kind of conduct has to be calculated to either intimidate or overthrow or otherwise affect the government. So then you have to ask yourself, in this case, and again with respect to especially my client, Brandon Baxter, at the time they put the C-4 on the bridge, what was their calculation, what was their intent? And you only need to go back to, and of course there are a ton of schemes that they talked about in this case, you only need to go back one scheme back, which was placing the C-4 in the water to try to hit a cargo ship. And they specifically said, other than the fact that it wouldn't work, and there was a discussion about that, but that entire purpose was in order to get merchandise off the market. And so then they said, well, the cargo ship won't work, the C-4 in the water won't work, let's do a bridge. Look at their specific intent. Even though the government may have been affected, it wasn't calculated to overthrow the government in this case. Wasn't there some indication that Mr. Baxter had indicated that by blowing up the bridge it would require the government to place security on virtually every bridge in the country, and wouldn't that fit the definition of intending to disrupt the government? No, because the fact that the government is going to react to it doesn't mean that their intent was calculated to do that. It's just, here's what's going to happen, it's just no different than if I could finish my… You've got 30 seconds. Thank you. He also said that if this goes off, we're going to end up in Guantanamo Bay as to one of the priorities. Now, that's not showing intent that they intended for terrorism. Again, it's a miscalculation on their part, but it shows that their intent wasn't that. Okay. Thank you, Mr. Chairman. Good morning, Your Honors. Dennis Spelly on behalf of the defendant, Anthony Payne. I'm not going to reiterate all the legal arguments here, but to attempt to make some factual distinctions with respect to my client. Mr. Payne originally met the co-defendants in October of 2011 at an Occupy meeting or assembly. He lived with them for a period of time, but then he was taken out of commission because he was charged with burglary in November and was not released from jail until January of 2012. Then he had sporadic contact with the other co-defendants, but it was not revealed to him until April 29, 2012, the day before the planting of these explosives about this plot to blow up the bridge. Mr. Payne cooperated with the government and actually testified at an evidentiary hearing involving the other co-defendants' sentencing, and the counsel for the government asked him to explain his understanding of the purpose behind the plant. The question was that you were told what purpose blowing up the bridge was going to serve, and he said yes. And again, the question was what purpose answers, quote, stop the transportation of the 1%, unquote. So this is the extent of the evidence regarding Mr. Payne's understanding of the purpose of this plot, and we would submit that that is insufficient to establish the evidence to support the terrorism enhancement with respect to him, and without any further insight as to any other motivations that anyone else may have had, the evidence falls below a preponderance of the evidence to support the enhancement in his case. Okay, can we impute the intent of the other three defendants in terms of attacking, impacting, or disrupting the government to Mr. Payne, who came in at the very end? Yes, provided that the true problem test for relevant conduct is satisfied. There's, of course, reasonable foreseeability, and I suppose the government would argue that, well, it was reasonably foreseeable that there may have been some additional motivation behind this. But the other important problem is jointly undertaking criminal activity, and that's where I don't think the government gets over the hurdle. There's no evidence here, at least for Mr. Payne, that he jointly undertook participation in a plot to do something more than, quote, stop the 1%. So without satisfying the relevant conduct test, we're back to the same point. My concern here, and I'll ask the government about this, but my concern here is that it appeared that the district court did not make the same particularized findings regarding Mr. Payne as the court did with respect to the other three defendants. That's true. With respect to the other three defendants, I think the court wrote the written opinion, but in Mr. Payne's case, the entire record consists of the transcript of the judge's oral comments, and he did not make those relevant conduct findings, at least not the two con findings. So does that make a difference? Does that mean we need to remand for findings, for some findings from the district court? Yes, if you feel there's evidence in the record to support those findings. But if you agree...  So there will be no point in the remand, just a reversal of that particular enhancement because the evidence in the record is lacking. Okay, thank you. Good morning. Tony Bay on behalf of the appellate of Douglas Strait. My pleasure, Your Honor, to be here this morning. I'd like to share an old saying with the panel before I begin. I think it brings some light on the leadership role of enhancement here. The old saying goes like this. He that pays the piper calls the tune. Don't know who wrote it, the knobs. I bring this to the court's attention because it is the underpinnings of the relationship between Doug Wright and the CHS in this case. The CHS controlled Douglas Wright in every way imaginable. When Doug Wright met the CHS, the CHS, of course, was pursuing him on behalf of the FBI, and Doug was homeless, had no vehicle, was living off food stamps. And right off the get-go, the CHS gave Doug Wright money. He wasn't supposed to do this. This is in the evidentiary during the FBI agent in the matters. And then pursued him some more and finally brought him in, gave him a job, gave him money, gave him a place to eat, a place to sleep. He controlled virtually every aspect of Doug's involvement with this plan in every way because of the money, because he funded everything, because he paid for the C-4, because he paid for the hotel room in which the C-4 was bought, because he had the transportation of an SUV to take Doug Wright and the other co-defendants around from meeting to meeting, place to place, and in fact to the bridge of that fateful night, to the Route 82 bridge. The very ability to go from point A to point B was controlled by the CHS. More importantly, and I suggest the court might want to take a look at the... He wrote a... Actually, I wrote it. It was a joint statement of facts in which we go to great detail of showing the involvement of the CHS over the course of the conspiracy, constantly cajoling, bullying, challenging Doug Wright and the other co-defendants about their inability to make decisions, their inability to come up with a target, cajoling them, telling them you have to make a decision, you have to make a decision, and it's always the CHS that's pushing, pushing, pushing. That was his role. He was the leader, unequivocally the leader. No doubt about it, and the facts in the case bring that out. That's about all I have, unless the court has any questions for me. Apparently not. Thank you. Thank you. May it please the court. I'm Duncan Brown, assistant U.S. attorney for the Northern District of Ohio, and I'm here representing the appellate in the United States of America. This appeal concerns the reasonableness of the court's application of the terrorism enhancement and the subsequent sentences. Based on the 36-page order, which is a document, 187 on the record, issued by the court, in which it analyzed the terrorism enhancement, the application of the non-application... What's the scope of review that we have? Your Honor, the scope of review is set forth in United States v. Washington, which is a 2013 decision. It establishes that it's a clear error, and that even with mixed questions of law or fact, the question is, is there a definite and firm conviction that a mistake has been committed, and that's the rule that we go through with. This 36-page decision, and then ultimately the court also issued sentencing memorandums of 1613, with 12 and 8 pages for each defendant. There is ample evidence on the record of the court's procedural and substantive reasonableness in considering all arguments, all evidence put forth in relation to the case law that it will do. The court, in reaching its decision for the application of the terrorism enhancement, relied on two Sixth Circuit cases. The first is United States v. Assi, which set forth a two-step analysis for the application, and then also procedurally looked to United States v. Imaui, also a Sixth Circuit case recently upheld, in which the court engaged in a bifurcated hearing system. There was an initial hearing in the Imaui case to determine whether the terrorism enhancement applied, and then there were separate sentencing hearings. The court followed the Imaui case bifurcation in this instance, and on November 5th and 6th held hearings as to whether the terrorism enhancement applied. Those hearings, the defendant Baxter testified, was able to be cross-examined by both the government and also by the court. Special Agent Ryan Taylor testified for the government, was able to be cross-examined by each and every defendant's counsel, and then briefs were submitted, both in relation to the pre-sentence reports and then also in relation to the hearing. Based on that procedure, the court then issued Document 187, which is its order applying the terrorism enhancement. And in that order, it both looked to why it should and how it could not apply the terrorism enhancement. Most tellingly, it looked to previous applications of the terrorism enhancement, both in the Sixth Circuit and also in other courts. It looked to, obviously, Assi and Graham in the Sixth Circuit, but then it also relied heavily on Hale, which is a Seventh Circuit case, United States v. Hale, in which a murder involved a murder plot with a federal judge. The court applied the terrorism enhancement because it promoted an enumerated crime within the 23rd to BG 5B. Is it fair to say that the court focused, via the memorandum and otherwise, on the conduct of Wright, Baxter, and Stevens, but not Hale? Well, Your Honor, no, the court did look to Hale as well, and this is, again, an ongoing plot. The night of the placement of the bombs, Hale was not only present, he was serving as a lookout. After the bombs were placed, and this is, again, looking to the intent, because, again, the terrorism enhancement speaks to the intent of the crime, the comment was made by Connor and Stevens in the presence of Hale. This is the greatest act of terrorism in Cleveland since the 1960s. So the words of the defendants themselves, they identified themselves as terrorists. One of the defense counsels mentioned Guantanamo Bay. Guantanamo Bay was actually mentioned on two separate occasions. It was not mentioned. They did not have the intent to go to the Caribbean. They saw Guantanamo Bay as the holding cell and the holding pen for the last ten years of international terrorists. They, again, saw that their punishment would place them in the realm of international terrorism. So, again, they were self-identifying with terrorists. During the drive to the Applebee's, which is the location of the detonation, they talked about going to Chicago again. And this is harking back to their intent and their desire that this event on April 30th would spark what they repeatedly called the Civil War that would start in Chicago. In Chicago, I believe, the week of May 7th, that year, there was both a conference of the G8 leaders and also NATO personnel that was going to be drawing a lot of political attention. And they saw that their actions this evening, or the evening of the 30th, would spark what they were calling the Civil War that would then lead to Chicago engagement with military and riot police. They also had, during their plots and during their target acquisitions, discussed the use of a concordant protest that was going to happen in Cleveland on May 1st as a possible distraction. So they'd get the police involved with protests at this, I think they called it a heart fest, and then they would be able to blow up whatever they were going to blow up. So, again, they saw themselves operating in a coordinated way to start what they described as a Civil War and that they saw the penalties for that Civil War as being treated as international terrorism. It seems that so many of these sort of key conversations that the court pointed to were between and among Baxter, Stevens, and Wright long before Haney. Well, Haney seemed not to focus much, in my sense anyway, Haney or maybe any specific findings in terms of Mr. Haney's intent. That's correct. And, Your Honor, you are correct, and I think that is where the court engaged in some application of Graham with the conspiracy using reasonable foreseeability. And in that case, in applying the doctrine of reasonable foreseeability, looking back towards Haney's engagement before he went to jail, he was living with defendant Wright in an abandoned church, and Wright was talking to him  to Haney how you blow up a church when Haney got out of jail, he came back to this group. And by April 29th, the discussion really had focused on the bridge and then the subsequent Civil War. There was also talk in the car as they were driving to detonate the bombs of getting a structural engineer or other types of experts to do more types of jobs. Again, this was all in the car. Mr. Haney was in the car at no time. This was still technically an attempt. He did not stop the car. He did not voice a dissent. And when specifically Mr. Wright, I believe, was talking, I think Mr. Wright or Mr. Baxter was talking about the structural engineer. Mr. Stevens had discussed, he said, the more we do this kind of thing, the more I realize that the Department of Homeland Security, which owns the fusion centers, or runs the fusion centers, has its heads up. Greg can use another word for that, and that we can get away with this. So there's talk of ongoing activities, which, again, Mr. Haney was present for. He did not object to during the detonation. He did not go outside and say to have a smoke or go to the bathroom. He was there while the bombs were trying to be detonated. He was there while Mr. Wright tried calling the person who purchased the bombs from an undercover agent and made sure his code was correct, and then reentered those codes multiple times. So while Mr. Haney was not the most active participant, he did have a knowledge that the court considered after lengthy hearings and lengthy pleadings that warranted the terrorist enhancement. Now, I think where the court did look to the length of Mr. Haney's participation was then in the sentence. And the sentencing court, again, in the sentencing memorandum, looking to the procedural and also substantive reasons of those sentences, took great pains to look at all of the 3553 factors affecting each defendant individually. While the court, during the first five-minute hearing, looked at the application of the terrorist enhancement individually and collectively when it came to sentencing, the court was very specific and very thorough in looking at each defendant individually and not just as one larger member of the collective. And I think in each of those sentencing memorandums, that procedure is abundantly clear. The defense raised in their argument, or the appellant raised in their argument, of a Leahy case also mentioned was Stewart at some point. And the court did contemplate Stewart. Both of those cases deal with almost, as defense counsel pointed out fairly aptly, almost facilities to communicate information in the Stewart case that the court looked at. The defendant, U3, was a translator. He was not an active participant. Here, the court differentiated Stewart, and the government referred to him to differentiate Leahy, because all of these participants actively participated. They were not translators. They were not mail carriers. They were not transmitting messages. They all participated in going to the location, placing the bombs, harming the bombs, and detonating the bombs. And they all knew that these were bombs. There is no mis-answer question about that. They looked at the bombs in the car on the way down. They talked about how, quote, beautiful they were. And they all understood how everything functioned. We're looking very briefly, turning very briefly, to the sentencing arguments raised by the defendants, or by most of the defendants. The government states that the proper standard of review is set forth in U.S. v. Curry, which, quoting Gall or adopting Gall, says that there's a deferential standard of review for abuse of discretion. And that deference is made greater when there are downward variances applied by the court. In this case, the court varied downward significantly and did so, again, in very thorough written decisions as to why the various 3553A factors applied to support those downward variances. Again, the court did this during a... part of that Maui bifurcated hearing. There were briefs submitted. There was testimony taken, argument made, and each defendant was done individually, not as a collective. The court provided calculations both based on the terrorism enhancements. Also, if the terrorism enhancement did not apply, he was not doing that as to provide himself an out or to provide himself a justification, but he was doing that to the government of Maui to show the interaction between the terrorism enhancement and the 3553A factors. And to that end, to address Defense Counsel's argument about the use of lifetime probation, the court was very concerned with one of the 3553A factors, which is rehabilitation in the age of the defendants. And the court, as I think was evidenced in the briefs, struggled very much with the idea of punishing them for a very serious crime but also giving them the tools and the opportunity to rehabilitate themselves for the rest of their lives. So his balancing or his consideration of lifetime probation and significant prison time was not a trade. It was not, you know, I'll knock off ten years if I give him more probation on the end. It was a recognition that looking at these factors and giving the factors good consideration, he had multiple sentencing options. And that is, in fact, the spirit of the call. And the duty under 3553A is to look at all the facts and circumstances and provide a reasonable and appropriate sentence. And that's what the court did. And the court explained its reasoning and its work very thoroughly in its papers. Did the court deal with Mr. Baxter's objections to sentencing? Yes, he did, Your Honor. And the standard there is set forth in White v. Tackett, which is a standard literal compliance. However, the Sixth Circuit's cases, United States v. Solero, Tarwater, and Monis, require that it's more than just a rote adoption of the language of the objections. And here, the defendant, Baxter, objected to the PSR report. He certainly submitted briefs for the November 5th and 6th hearing. He actually was the only defendant to testify at that hearing, other than Mr. Hain. But he was the only defendant to testify. He was able to present his case, to raise his objections, to present his justifications or his arguments. He was able to explain himself further on cross-examination and also by examination by the court. Looking at the court's order, the 187 for the terrorism enhancement, and also specifically Mr. Baxter's sentencing memorandum, the subject matter and the intent of those objections is certainly considered. And the court provides ample discussion of all of those issues raised. So the government would argue that the court, looking to Solero, Tarwater, or Monis, did, in fact, adequately address those objections. And the adequate address of the objections is in the memorandum? Yes, Your Honor. It was a... Sorry, I'm getting sides of the podium mixed up here. Mr... Please, Mr. Harper. Mr. Baxter's was a document 206-1. And then also read in conjunction with 187. And also turning very briefly to the enhancement for rights of leadership, which was raised by Defendant Wright. Again, the United States v. Washington standard applies here, which is clear error. And the government would argue a fairly deferential standard given the document 187, in which it's discussed as it is in document 205, which is Wright's sentencing memorandum. Wright's counsel argued... made arguments about the confidential human source. This was an issue that was never raised as entrapment. The court discusses at length both the role of the confidential human source in this case. He also makes reference to a mallet, which contains a very lengthy discussion of the role of confidential human source in a case like this. The court refused to recognize any sort of entrapment. And also looking at, again, 3553A factors, he looked at the relationship between Wright and the confidential human source in those downward variances. Payne did provide testimony directly about the role of Wright, who brought in the people who picked out the plan, who was the driving force. And the government would argue that more fully developed in the hearings that occurred both on November 5th and 6th, and certainly prior to that, it was well established that Wright recruited everybody. Wright picked out the bridge location, the Route 82 bridge in Bracksville, Ohio. Wright was the first one to say that he was trying to make C-4 or wanted to buy C-4. So he did take a leadership position. Specifically, that night, he was the one who placed it... the bridge. He armed the bombs. He volunteered to have a detonator. He typed in the codes. When the codes, he didn't think, worked, he called the undercover to make sure he got the right codes. So the leadership enhancement was applied by the court after hearing all of that testimony. And it should be noted that the court could have applied a four-level or a three-level enhancement. He chose to apply only a two-level, and that's because the court was able to review and consider multiple arguments. So again, using the Washington standard, the court was both procedural and substantive, reasonable in its application, and there is no clear error. One very brief point, just to revisit some questions that the panel had raised. Looking at the selection of the Route 82 bridge should not be done in a vacuum. Defendant Baxter was the first defendant to talk about blowing up a bridge, and the court was right that they thought their response was going to be that the government would place agents or police or somebody at every bridge in America. The government contends that, yes, we certainly did use the term 1%. We adopted it as they adopted it. However, the defendants were using what could be best sort of described as a juvenile or immature understanding of government and wealth. They saw the two as intricately linked, that they went from bridges to the Federal Reserve to a casino to banks to the Fusion Center, shows that they think that the 1% controls the government, and so they're used sort of interchangeably. The government would argue that, based on the evidence presented during the hearings and the briefs, based on the recordings, the reason the Route 82 bridge was chosen was quite simply it was the softest target. The Federal Reserve, they talked about putting bombs on armored cars. They didn't think that was feasible. They talked about blowing up other bridges in downtown Cleveland, but they were worried about security cameras. When Doug Wright presented the selection of the Route 82 bridge to the confidential human source, he said, you know, I found this one. It's in a park. It looks like it would be easy to get to. They, in fact, surveilled it. This bridge does cross over a national park in addition to just being a bridge, so there is that, and it also is a bridge. Again, it's not, looking at the case outside of the vacuum of just these briefs, it's a bridge that does connect Route US-271 to 77 to 480 and 80, so based on information provided by the Department of Transportation, about 14,000 cars travel in a day, including trucks and interstate commerce. The government would argue that looking at the case in a whole, because they were talking about a civil war and because they saw that this was the first step in sort of the G8, the nanorides that they thought were going to happen, this sort of confused understanding of the one percent in government and the multiple selections of very relevant government targets, the application of the terrorism enhancement was appropriate. The procedure employed by the court was not clearly erroneous, and the facts that are considered both from the briefs during the hearing and in its memorandum are clearly not erroneous. There are no further questions. Thank you very much. Okay, thank you, Mr. Brown. Your Honor, we're going to divide up our rebuttal. I'm going to take five minutes now, and Mr. Belli's going to take a minute, Mr. Baker is going to take a minute as well. The big scary words here are terrorism and civil war, and the government wants to paint that picture to you so that you don't look at the specific facts of the case because those two phrases are scary. And the facts of this case, the offense that occurred in this case is scary. But the government, the Congress, has made a specific analysis of what constitutes a federal act of terrorism, and it requires that a specific intent, and I didn't hear my opposing counsel talk about that specific intent because that's critical to this case. It has to be calculated. The actions of the defendants have to be calculated to either overthrow or disrupt the government in this case. But there are a myriad of people, there are a myriad of people who are victims or potential victims or innocent bystander victims of all of these offenses that were at least discussed. Does that mean because that there is someone that is affected by one of these offenses that they become victims for whom the defendants calculated that they would be the ones that would be the victims in this case? Just taking the bridge, for example. So let's say the bridge actually blew up. So there would be people that were on the bridge at the time driving over. Did the defendants calculate that they were the intended victims, or was it the government, or was it the 1%? How about the people that the next day had to get to work and couldn't get to work because they were going over the bridge? Well, Mr. Hain, who is the government's own witness at the motions hearing in this case, says two things. First, when he talks to the FBI, he specifically says, hey, we wanted to make sure people didn't get to work the next day. So he's identifying the intent, and it's not the government. Second, he says that we're blowing up the bridge to stop the 1%. Again, he's identifying, a government witness identifying this is who we intend to do it. There may be other people that get hurt by this, but we are intending this to stop the 1%. Now, you may all say, well, Judge Bertelsmann, early on in the argument, you said something to the effect that, well, they have to get the government to get the 1%. And I don't think that we're that far along yet in the United States. We contend that there's this open, capitalistic society and that corporations can act independently of a lot of government interference. At least that's what at least half of us say on any given occasion. So the issue here is, by targeting the 1%, does that automatically mean that we target the government? And does that mean that we target... You're calling out the argument. Isn't the contention by a lot of the people that talk to your clan and clans do that the 1% controls the government? Ideologically, isn't that their position? Absolutely. Absolutely. Yeah. So let's say that somebody wanted to assassinate me, right? And I have a boss who's the federal public defender. And they come and they absolutely... They take me out. Does that mean that they calculated to go against the federal public defender just because he controls me in my actions? No. The answer to that is no. So regardless of whether they... Logically, that may be the case, but the question would be whether the clans here think and speak that precisely about these issues. Perhaps they do, actually. That's another problem here. Look at page 2363. They also say that they want to target the KKK and the neo-Nazis. Now, are we saying that they're intended victims here, too, and that the blowing up of the bridge was calculated to interrupt the KKK and the neo-Nazis simply because they said it? That's the whole problem with this case. We'd like to say that it's terrorism. But that's exactly right. They're blowing up the bridge to get to the 1%. We have to equate the 1% to the government in order for this enhancement to apply, and we just can't do that in this case. It's not supported by the law, and it's not supported by the evidence in this case. Thank you. Thank you, Mr. Chair. Judge Cole, you had asked me whether the intent of the co-defendants could be imputed to Mr. Hain. One of my colleagues pointed out to me that this issue was addressed by the Second Circuit in U.S. v. Stewart that has been mentioned, and the Second Circuit in Stewart said that relevant conduct principles do not apply to this enhancement because relevant conduct applies to the acts of co-defendants, not to the intent of the co-defendant. So I'm going to revise my position slightly and urge the Court to follow Stewart, and my other comments regarding relevant conduct would be my fallback position in the event that the Court does not follow Stewart. I will hear Mr. Brown say that at the end of the day, though, the district court sufficiently addressed Mr. Hain or Haney's intent via sort of the foreseeability of the actions here. There were early discussions involving Mr. Haney, and, of course, he was involved beginning on the 29th. So that's enough, really, when you put it all together to sufficiently show that he had the same intent, arguably, as the other three. The judge's comments may have been sufficient for the foreseeability prong, but we still maintain that jointly undertaken criminal activity is an entirely separate prong of the two-prong test, and these comments would not support findings on that second prong. Thank you. I concede that my client introduced the other gentleman to the CHS. That alone is not enough for leadership enhancement. Case law supports that. Specifically as to the government's contention that Doug Wright picked the Route 82 bridge as a soft target. It is not supported by the facts. It is not supported by the record. It's simply not. And if they say enough over and over again, it's still not supported by the record. I'm not going to repeat my argument, but I have written on this on page 17 and 18 of my brief, and I invite the panel to look at that. Thank you, Your Honor. Okay. Well, thank you, Counsel, for your arguments this morning. It's certainly elected that Mr. Day and Mr. Daly would take this case pursuant to the Criminal Justice Act. That's a real service to the courts and to your clients, so we do appreciate that. And the case will be submitted.